Howard L. CHABNER, Plaintiff,

v.

UNITED OF OMAHA LIFE INSURANCE COMPANY, and Does 1 through 100, inclusive, Defendants.

No. C–95–0447–MHP.

United States District Court, N.D. California.

Jan. 16, 1998.

Sidney M. Wolinsky, Guy B. Wallace, Disability Rights Advocates, Oakland, CA, for Plaintiff.

Horace W. Green, Nick C. Geannacopulos, Michele Floyd, Seyfarth Shaw Fairweather & Geraldson, San Francisco, CA, for Defendants.

### MEMORANDUM AND ORDER

PATEL, Chief Judge.

Plaintiff Howard L. Chabner, on his own behalf and purporting to represent a class, brought this action against defendant United of Omaha Life Insurance Company ("United of Omaha") in California Superior Court alleging discrimination on the basis of disability under: (1) California Insurance Code section 10144; (2) the Unruh Civil Rights Act, California Civil Code sections 51 *et seq.;* and (3) the Unfair Business Practices Act, Cali-

fornia Business and Professions Code sections 17200 *et seq.* Chabner also asserted a fourth claim for fraud. United of Omaha removed to this court on diversity grounds, 28 U.S.C. section 1332, whereupon Chabner amended his complaint to add a claim under the Americans with Disabilities Act ("ADA"). See 42. U.S.C. §§ 12101 et seq. Chabner seeks declaratory and injunctive relief, as well as statutory minimum damages.

Per an earlier order, this court denied Chabner's motion for class certification and deferred ruling on plaintiff's motion for summary judgment, requesting that the parties file supplemental briefing on the applicability of the ADA to insurance underwriting. Now before the court is Chabner's motion for summary judgment on all except his fraud claims. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

## BACKGROUND [1]

Plaintiff Chabner is a 35 year-old, non-smoking man who has fascioscapulohumeral ("FSH") muscular dystrophy ("MD") and uses a wheelchair. In May 1993, Chabner applied for a life insurance policy with United of Omaha. United of Omaha issued Chabner a whole life insurance policy in which the cost of insurance was $305.44 for the period from July 1993 to July 1994. The same insurance for a non-smoking man of Chabner's age without FSH MD would have cost $155 .44 for the same period.[2]

In estimating Chabner's mortality risk, United of Omaha had no internally developed actuarial data regarding FSH MD, so its underwriter consulted two externally developed manuals: the Cologne Life Reinsurance Company's "Life Underwriting Manual" ("Cologne manual") and "Medical Selection of Life Risks" by R.D.C. Brackenridge and W. John Elder ("Brackenridge manual"). See Subbotin Dec. ¶ 3; Anderson Dec. ¶ 6, Exs. B, C. According to United of Omaha, its underwriter determined Chabner's mortality risk rating "based in large part on his medical records"[3] and to a lesser degree on the Brackenridge manual and the Cologne manual. The underwriter concluded that Chabner had a "moderately progressive" form of FSH MD[4] and, based partly on the Brackenridge manual's recommendation of an incremental mortality rate between 75 and 150 percent for "slowly progressive" FSH MD,[5] authorized a policy with a "Table 6" rating, which corresponds to a 150 percent increase above standard mortality rate.[6] Because the mor-

---

1. Unless otherwise noted, this background section is the same as that in the court's earlier order.

2. As in any whole life insurance policy, a portion of Chabner's premiums went to purchase insurance, while the remainder was invested. It is undisputed that Chabner pays $150 more per year for the insurance portion than would a person with average life expectancy. United of Omaha's argument that it did not discriminate because Chabner's total premium equaled an average life expectancy premium is wholly without merit. Each month, more of Chabner's premium went to life insurance and less was invested. United of Omaha therefore charged Chabner a higher price for a service—life insurance. Hereinafter, "premium" will be used to denote the applicant's cost of insurance, and the overall whole life insurance payment will be referred to as the "total premium."

3. A number of items in Chabner's medical history may have informed United of Omaha's decision to charge a rate differential. Chabner's muscular dystrophy had become "progressive," he was taking prednisone, and his extremities revealed a "marked wasting." Anderson Dec., Ex. A at UNI 00067. He was confined to a wheelchair and had experienced occasional falls.

*Id.* at UNI 00072, 00075. His physician had "suggested a routine electrocardiogram every two years until the age of 40 and every year after that to rule out cardiomyopathy." *Id.* at UNI 00097.

4. In Chabner's medical records, however, his doctor described the progression of his disease as "slow," Anderson Dec., Ex. A at UNI 00073, and "stead[y]." *Id.* at UNI 00084.

5. The Cologne manual, which the underwriter also consulted, recommended a rating of at least 300 percent extra mortality. The Cologne manual purports to contain information prepared "using statistical and other information available to [Cologne]." Anderson Dec., Ex. B at second unnumbered page.

6. Generally, as mortality rate increases from the standard due to an applicant's nonstandard risk characteristics, the applicant's total "mortality ratio" increases from 100 percent. See Anderson Dec., Ex. C at 86–87. The exact increase is derived from the observed mortality rate in a population with a given impairment as compared to the mortality rate expected without the impairment. *Id.* The total mortality ratio is then applied to the premium for a standard risk

tality rate in a population with the applicant's risk profile is directly proportional to the appropriate premium, the Table 6 rating corresponds to a 150 percent increase in Chabner's premium. United of Omaha subsequently set Chabner's actual insurance cost at 96.5 percent higher than standard.[7]

After Chabner inquired about the basis for his nonstandard premium, United of Omaha's Vice President and Senior Medical Director of Underwriting, Robert J. Quinn, M.D., responded in a letter that FSH MD "has only a small effect on mortality" and reduces life expectancy by only four years for a nonsmoking man of his age. Chabner Dec., Ex. A at 1. United of Omaha now estimates the decrease in life expectancy at nine to eleven years, but that estimate is based solely on United of Omaha's own conclusion that Chabner should be rated as a "Table 6" applicant.[8]

On January 3, 1995, Chabner brought this action against defendant United of Omaha in California Superior Court alleging discrimination on the basis of disability under California Insurance Code section 10144, the Unruh Civil Rights Act and the Unfair Business Practices Act. Chabner also alleged fraud. United of Omaha removed to this court on diversity grounds and Chabner amended his complaint to add a claim under the ADA. Chabner seeks declaratory and injunctive relief, as well as damages. He now moves for summary judgment on all but his fraud claims.

applicant to determine the rated policy premium. *Id.* at 80–81. An applicant with more than one impairment that affects life expectancy will have more than one impairment-specific increase to his or her mortality ratio and, in turn, to his or her premium. *Id.* at 80–81, 87. Thus, a person who is twice as likely as a standard risk applicant to die during the period of coverage will be charged 200 percent of the standard premium.

"Table" ratings simply represent conclusions as to the incremental increase in the premium for an applicant from a population with a "rated," or nonstandard, mortality rate. At United of Omaha, each successive numerical table rating adds 25 percent to the cost of insurance. Thus a Table 6 rating would add 6 × 25% = 150% to the cost of a standard policy. Without some reason to anticipate that the population with the applicant's risk profile would have a higher than standard mortality rate, there is no logical or

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations, *Anderson*, 477 U.S. at 249, and the inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

## DISCUSSION

**I. *Liability for Disability Discrimination in the Insurance Context***

■ At the core of Chabner's claims is California Insurance Code section 10144:

legal reason to assign the applicant a table rating.

7. Chabner's $305.44 premium equals 196.5 percent of the standard rate of $155.44, which corresponds to a mortality ratio equal to 196 .5 percent of standard.

8. The dispute over life expectancy is important only insofar as it relates to mortality rate. As discussed above, the actuarial basis for increasing a life insurance premium is an increase in the observed or expected mortality rate for a population with the applicant's risk profile during the policy period. A decrease in average life expectancy does not necessarily indicate an increase in mortality rate during the policy period because the higher-than-average incidence of death may not occur until well after the applicant's age.

No insurer issuing ... any contract of individual or group insurance providing life ... benefits ... shall refuse to insure, or refuse to continue to insure, ... or charge a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal ... or rate differential is based on sound actuarial principles or is related to actual and reasonably anticipated experience....

Cal. Ins.Code § 10144. Chabner claims United of Omaha violated this section by charging him a significantly higher rate based solely on his FSH MD without basis in sound actuarial principles or relation to actual and reasonably anticipated experience.

■ Neither the parties nor the court has found any authority explicitly confirming or denying the existence of a private right of action under Insurance Code section 10144. In general, a court may infer a private right of action where a statute protects a class of persons without providing a civil remedy, the remedy furthers the legislative purpose, and the remedy is necessary to ensure the statute's effectiveness. *Middlesex Ins. Co. v. Mann*, 124 Cal.App.3d 558, 570, 177 Cal. Rptr. 495 (1981) (quoting Restatement 2d of Torts section 874A); *but see Moradi–Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58 (1988) (holding no private action exists under statute regarding insurers' bad faith refusal to settle) and *Crusader Ins. Co. v. Scottsdale Ins. Co.*, 54 Cal.App.4th 121, 62 Cal.Rptr.2d 620 (1997)(disagreeing with Middlesex on the basis of Moradi–Shalal which was decided after Middlesex).

Here, Chabner has a private right of action under California's Unfair Practices Act for any business practice forbidden by law. See Cal. Bus. & Prof.Code §§ 17200, 17204; see also *People v. McKale*, 25 Cal.3d 626, 631–32, 159 Cal.Rptr. 811, 602 P.2d 731 (1979). As a result, a private right of action need not be inferred under section 10144, which defines an unlawful business practice, to ensure its effectiveness. In sum, although there is no private right of action under Insurance Code section 10144, California's Unfair Practices Act provides a private right of action where section 10144 has been violated. Section 10144 also helps to define the contours of liability under both the ADA and Unruh Civil

Rights Act, each of which provide for private claims.

Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the ... services ... privileges, [or] advantages ... of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The ADA also includes a "safe harbor" provision, which states that: "[the ADA] shall not be construed to prohibit or restrict ... an insurer ... from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law ...." 42 U.S.C. § 12201(c).

ADA section 12201(c) was intended to adopt the standard expressed in a model regulation which is substantially similar to California Insurance Code section 10144. See *Piquard v. City of East Peoria*, 887 F.Supp. 1106, 1120–21 (C.D.Ill.1995); see also 28 C.F.R. Ch. I, Pt. 36, App. B, § 36.212 at 612 (1995). The model regulation, created by the National Association of Insurance Commissioners ("NAIC"), made it illegal to refuse insurance or charge a different rate based solely on disability "except where the refusal ... or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience." Model Regulation on Unfair Discrimination in Life and Health Insurance on the Basis of Physical or Mental Impairment § 3 (National Ass'n of Ins. Comm'rs 1993) (hereinafter "NAIC Model Regulation").

Chabner argues that California's Unruh Act, in turn, incorporates the protections of the ADA. The Unruh Act was amended in 1992 to provide that "a violation of the right of any individual under the Americans with Disabilities Act of 1990 ... shall also constitute a violation of this section." Cal. Civ. Code § 51 (West Supp.1996). In addition, the Unruh Act provides for a private right of action. Cal. Civ.Code § 52(c).

In their earlier pleadings, the parties seemed to assume, without much argument or citation to caselaw in this or other circuits, that the ADA was applicable to insurance underwriting and that an insurer functions as

a "public accommodation" for the purposes of the statute. The parties have since briefed the issue, with United of Omaha now arguing that Title III of the ADA covers only discrimination in the physical access to goods and services. Thus, before deciding the merits of Chabner's summary judgment motion, the court must determine whether the ADA is applicable to this action.

### A. *Applicability of the ADA*

■ Pursuant to 42 U.S.C. § 12182, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." Section 12181(7) sets forth examples of "private entities that are considered public accommodations" for the purposes of the Title III, including "insurance office[s]." 42 U.S.C. § 12181(7)(F).

In addition, Title III prohibits places of public accommodation from providing unequal or separate benefits to persons with disabilities. 42 U.S.C. § 12182(b)(1). Specifically:

> It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individuals or class of individuals with a good, service, facility, privilege, advantage or accommodation, or other opportunity that is as effective as that provided to others.

42 U.S.C. § 12182(b)(1)(A)(ii).

Furthermore, Title III also sets out examples of discriminatory actions. For example, it is a violation of the statute for a public accommodation to fail:

> ... to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

42 U.S.C. § 12182(b)(2)(A)(ii).

The court now finds, based on the plain language of the statute, that Title III applies to insurance underwriting practices. It is axiomatic that courts must interpret statutes "so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (citing *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)). Finding that Title III applies only to physical barriers to entry would render meaningless the provisions providing for equal access to goods and services. See, 42 U.S.C. § 12182(b)(1)(A)(ii). In addition, the sections dealing with modifications in policies to ensure "goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities" would similarly be superfluous. See, 42 U.S.C. § 12182(b)(2)(A)(ii); *Kotev v. First Colony Life Ins. Co.*, 927 F.Supp. 1316, 1321–22 (C.D.Cal.1996); *Cloutier v. Prudential Ins. Co.*, 964 F.Supp. 299, 302 (N.D.Cal.1997).

Perhaps most importantly in conjunction with a claim such as this one, the "safe harbor" provision of the ADA for insurers would be rendered utterly meaningless if the court did not hold that Title III applied to insurance underwriting practices. The safe harbor provision states that:

> Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—
>
> (1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law.

42 U.S.C. § 12201(c)(1). If Title III were meant only to prevent insurance companies from denying persons with disabilities equal access to the physical plants of insurance offices, there would have been no need for

Congress to include the safe harbor provision dealing with underwriting practices.

The legislative history of Title III also supports the court's conclusion. For example, one House Report, while discussing the safe harbor provision for insurers, emphasized that an insurer would not be able to "charge a different rate for [insurance] coverage solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience." 1990 U.S.C.C.A.N. 267, 420. The Report goes on to emphasize that the safe harbor provision may not be "used as a subterfuge to evade the purposes of titles I, II and III of this legislation." 1990 U.S.C.C.A.N. 267, 420. In addition, another House Report stated that the safe harbor provision "makes it clear that insurers may continue to sell to and underwrite individuals applying for life, health, or other insurance on an individually underwritten basis, or to service such insurance products, *so long as the standards used are based on sound actuarial data and not speculation.*" 1990 U.S.C.C.A.N. 267, 493 (emphasis added). If the ADA did not cover underwriting practices at all, as United of Omaha contends, such pronouncements in the legislative history would be rendered meaningless.

United of Omaha urges the court to find that Title III deals solely with physical barriers to access. To begin with, contrary to the court's analysis above, it contends that the safe harbor provision indicates that Congress adopted a hands-off approach to underwriting practices and instead left the issue to the states to decide. According to United of Omaha, the safe harbor provision makes clear that the ADA does not apply to underwriting procedures. This argument, however, is without merit. Although section 12201(c)(1) does refer to state law, it does not in any way suggest that Title III of the ADA is not applicable to underwriting practices. Instead, a more reasonable interpretation of the provision is that in order to comply with the mandate of the ADA, the risk underwriting engaged in by insurance companies must be based on or not inconsistent with state law. See, e.g., *Kotev*, 927 F.Supp. at 1322

(finding that insurers would not need the safe harbor provision if they "could never be liable under Title III for conduct such as the discriminatory denial of insurance coverage.")

Defendant also points to several cases in support of it argument.[9] For the following reasons, however, these cases are either inapposite to the issues currently before this court or the court respectfully disagrees with their reasoning.

The primary case relied upon by defendant is *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006 (6th Cir.1997), *petition for cert. filed*, 66 U.S.L.W. 3338 (Oct. 30, 1997), where a divided *en banc* panel considered whether a benefit plan provided by an employer fell within the prohibitions of Title III. Concluding that "a benefit plan offered by an employer is not a good offered by a place of public accommodation," the court disagreed with Doukas and Kotev, and held that a benefit plan offered by an employer and administered by a insurance company was not within the purview of the ADA. *Id.* at 1014.

Although at first blush this case may seem to be problematic for plaintiff, a close reading demonstrates that its holding is limited to its facts, which are quite different from those of the instant case. For example, the court made clear that plaintiff Parker "did not seek the goods and services of an insurance office" but rather accessed a plan provided in the first instance by her employer. *Id.* at 1010. In fact, in holding that plan was not a good or service offered by a public accommodation, the Sixth Circuit emphasized that no member of the public could obtain the long-term disability policy that plaintiff had directly from Metropolitan Life as it was a product of negotiations between the insurance company and her employer. Id. at 1011. Chabner, on the other hand, purchased insurance directly from United of Omaha. His policy had nothing to do with his employer.

In addition, the Parker court recognized that employee benefit plans were governed by Title I and not Title III of the ADA. Id. at 1014–15. As Chabner's plan with United of

---

**9.** Neither the Ninth Circuit nor the Supreme Court have considered this issue.

Omaha was not connected to any employer, Title I is not at issue here. Furthermore, the *Parker* court held the ADA was not implicated because the ADA prohibits only discrimination between the disabled and the non-disabled, and the policy at issue discriminated between people with different types of disabilities (specifically, mental and physical). *Id.* at 1015. Here, however, plaintiff is alleging, and defendant does not dispute, that he was treated differently than non-disabled persons, not differently than persons with dissimilar disabilities.

It is true that the Sixth Circuit concluded that "a public accommodation is a physical place." *Id.* at 1014.[10] In so doing, it disagreed with *Carparts Distribution Center, Inc. v. Automotive Wholesale's Ass'n of New England*, 37 F.3d 12, 19–20 (1st Cir.1994) where the court held that a person need not have physically entered a structure in order to be protected from discrimination. See also, *infra.* The Sixth Circuit based its conclusion on the "clear connotation" of the statute. *Id.* at 1014. For the reasons discussed *supra*, however, this court finds that the plain language of the statute supports its application to insurance underwriting practices. Thus, it respectfully disagrees with the Sixth Circuit.

Defendant also relies on *Pappas v. Bethesda Hospital Association*, 861 F.Supp. 616 (S.D.Ohio 1994), in support of its' argument.[11] There, the court held that Title III claims were limited to "an inability to make physical use of the services of a place of public accommodation." *Id.* at 620. Pappas however, is also distinguishable from the case at bar as the Pappas plaintiff was challenging an insurance plan provided by her employer, not one provided directly by an insurance company. *Id.* at 617. In addition, the court cited to no cases supporting its finding, instead relying on its interpretation of the language of the statute. As discussed *supra*, this court has

concluded that the plain language of the statute supports a finding that insurance underwriting practices are covered by Title III of the ADA and thus respectfully disagrees with the Pappas court.

Instead, this court adopts the sound reasoning underlying the opinions of the numerous courts that have held that claims of discrimination in underwriting are cognizable under the ADA. Although the Ninth Circuit has yet to consider the issue, two district courts in California have concluded, based on the language of the statute, the policies behind that ADA, and the legislative history, that Title III encompasses insurance underwriting. *Kotev*, 927 F.Supp. at 1320–23, *Cloutier*, 964 F.Supp. 299, 301–02. In addition, numerous other district courts, for similar reasons, have held the same. See, e.g., *Doukas v. Metropolitan Life Ins. Co.*, 950 F.Supp. 422, 424–27 (D.N.H.1996) (concluding that "under the plain language of Title III, the Act would extend to the substance or contents of an insurance policy"); *Baker v. Hartford Life Ins. Co.*, 1995 WL 573430, *3 (holding that while the word "place" does imply a physical location, "the ADA does not require a plaintiff to be physically present at the place of public accommodation to be entitled to non-discriminatory treatment.")

In addition, while no circuit court has yet held that Title III encompasses insurance underwriting, the First Circuit has concluded that a person need not have physically entered a structure in order to be protected from discrimination. *Carparts*, 37 F.3d at 19–20. As the court succinctly stated:

> Neither Title III nor its implementing regulations make any mention of physical boundaries or physical entry. Many goods and services are sold over the telephone or by mail with customers never physically entering the premises of a commercial entity to purchase the goods or services. To

---

**10.** The court did not hold, however, that one must have been denied physical access to a place of public accommodation in order to bring an ADA claim. Rather, the court stated that it "express[ed] no opinion as to whether a plaintiff must physically enter a public accommodation to bring suit under Title III as opposed to merely accessing, by some other means, a service or good provided by a public accommodation." *Id.* at 1011, n. 3.

**11.** Defendant's papers, submitted prior to the Sixth Circuit decision in Parker, also cite to the lower court decision in that case. *Parker v. Metropolitan Life Ins. Co.*, 875 F.Supp. 1321 (W.D.Tenn.). As there is now an appellate decision in that case, the court need not deal with the district court's opinion.

exclude this broad category of businesses from the reach of Title III and limit the application of Title III to physical structures which a person must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.

*Id.* at 20; accord, *Shultz v. Hemet Youth Pony League,* 943 F.Supp. 1222, 1225 (C.D.Cal.1996).

Thus, the clear weight of authority supports the court's conclusion that insurance underwriting is covered by Title III of the ADA.

## II. *Application of the Safe Harbor Provision*

As discussed *supra,* the safe harbor provision of the ADA incorporates state law. Under section 10144 of the California Insurance Code, any rate differential must be based on "sound actuarial principles" or related to "actual and reasonably anticipated experience." In addition, a violation of the ADA also constitutes a violation of the Unruh Act. Cal. Civ.Code § 51. Therefore, each of plaintiff's claims require the court to make the same inquiry, specifically, whether United of Omaha based its rate differential on "sound actuarial principles" or on grounds related to "actual and reasonably anticipated experience."

### A. *Burdens of Proof*

■ The parties dispute who bears the burden of proof as to whether the insurance rate differential is based on sound actuarial principles or is related to actual and reasonably anticipated experience. Chabner's argument that section 10144 expressly places the burden on the defendant insurer is without merit. Similarly, the statute does not identify itself as an affirmative defense, perhaps because it is stated hortatorily and not as a cause of action.

However, in Piquard, after construing ADA section 501(c), 42 U.S.C. § 12201(c), to hold insurers to a standard virtually identical to California Insurance Code section 10144, the district court determined that the defen-

dant in an action under the ADA bore the burden of proving the insurance plan conformed to state law. 887 F.Supp. at 1125. Basing its decision on the Equal Employment Opportunity Commission's ("EEOC") Interim Policy Guidance on ADA and Health Insurance, the court explained: "In the health insurance context, the defendant ... insurer has control of the risk assessment, actuarial, and/or claims data relied upon in adopting the challenged disability-based distinction. The plaintiff has no access to such data." *Id.* Although the EEOC's Interim Policy addressed employer-provided health insurance plans and the Piquard court applied it within the employment benefit context, its reasoning is persuasive applied to insurance issues outside of the employment context. Furthermore, the prejudice to Chabner that might result from United of Omaha's control of the evidence regarding its actuarial process could be mitigated by shifting the burden of production instead of the burden of proof.

At least one court applying the ADA has employed the burden-shifting analysis from Title VII discrimination cases. See *Doe v. Kohn Nast & Graf, P.C.,* 862 F.Supp. 1310, 1316 (E.D.Pa.1994) (Title VII standard applied under in employment case under ADA). Under Title VII discrimination law, generally, if the plaintiff "satisfies the minimal requirements" of proving a prima facie case of discrimination by a preponderance of the evidence, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the challenged conduct. See, e.g., *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). The ultimate burden of persuasion, however, remains with the plaintiff. *Id.* 113 S.Ct. at 2747.

Here it is undisputed that Chabner was charged a substantial rate differential based solely on his disability. Analogous to a Title VII defendant's burden of producing a nondiscriminatory reason, United of Omaha must now come forward with evidence that the rate differential was based on sound actuarial principles or experience. United of Omaha's argument that Chabner's prima facie case also must include proof that there

was no sound actuarial basis finds no support in case law or logic. However, if United of Omaha produces evidence that the differential was based on the permitted exception, Chabner must overcome that evidence and ultimately prove otherwise.

Under the Unruh Act, "[a] violation of the right of any individual under the [ADA] shall also constitute a violation of [section 51 of the Unruh Act]." Cal. Civ.Code § 51. At least where, as here, a plaintiff bases an alleged Unruh Act violation solely on liability under the ADA, the allocation of burdens should be the same for the purpose of determining liability under both statutes.

United of Omaha argues that because it has identified the sources it consulted to establish the rate differential, Chabner is equally capable of proving whether those sources, including his own medical records, represent sound actuarial principles or actual and reasonably anticipated experience as required by Insurance Code section 10144. The question, then, is whether United of Omaha produced evidence sufficient to create a genuine issue of material fact that the process it used conformed to sound actuarial principles or experience.

### B. *Sound Actuarial Principles or Experience*

■ Chabner's argument boils down to this: United of Omaha has discriminated against Chabner by increasing his insurance rate solely due to his disability and without any sound actuarial basis or relation to actual experience. His summary judgment motion is based primarily on these facts: first, United of Omaha's underwriter authorized a non-standard rate for Chabner based on her subjective evaluation of his medical records, which merely described his disability, and on industry manuals which lacked any sound actuarial basis; then, for unknown reasons, United of Omaha set an actual insurance cost different from that recommended by its underwriter. United of Omaha does not dispute that its underwriter relied on neither

personal experience with FSH MD applicants nor internally developed actuarial data regarding FSH MD. Instead, it argues that its underwriter's discretionary evaluation of Chabner's application and medical records and consultation of industry manuals constituted sound actuarial principles or experience. Chabner essentially contends that United of Omaha has failed to carry its burden of producing evidence to show Chabner's rate differential is based on sound actuarial principles. Chabner further contends that even if the burden were upon him to prove United of Omaha failed to base the rate differential on actuarial data, he has met that burden.

Where underwriters are permitted to exercise significant discretion in setting insurance rates for people who represent non-standard risks, the potential for disability-based discrimination surely exists. Similarly, if underwriters rely on industry manuals and standards which lack any basis in actuarial data or experience to determine the extra mortality corresponding to a non-standard risk, the specter of institutionalized discrimination looms.

■ United of Omaha has not carried its burden of producing evidence that the rate differential was based on sound actuarial principles. According to United of Omaha, its underwriter determined Chabner's rate differential by reviewing his application and medical records, by applying her experience, which included some experience with MD but none with FSH MD specifically, and by consulting generally accepted underwriting sources.[12] While sound actuarial principles may include elements of discretion and judgment based on individual circumstances, they must also include reference to some sort of actuarial data either in the form of actuarial tables or clinical studies estimating mortality rates. *See* 28 C.F.R. Ch. I, Pt. 36, App. B, § 36.212, at 612 (1995) (individual underwriting standards must be based on sound actuarial data and not on speculation). The ex-

---

12. Before 1982, Insurance Code section 10144 allowed rate differentials based on "actual experience, or if insufficient actual experience is available, then [on] sound underwriting practices." In 1982, however, the legislature substituted the original requirement that rate differentials be based on "actual or reasonably anticipated experience" or "sound actuarial principles." The legislative history, therefore, suggests that an insurer cannot rely on the "general acceptance" of its underwriting sources.

cerpts of the Brackenridge manual found in the record contain no relevant actuarial tables whatsoever. United of Omaha argues that the Brackenridge manual summarizes actuarial data and points to a footnote following the chapter assigning a 75 to 150 percent extra mortality rating to FSH MD as evidence that the rate differential is based on a clinical study.[13] However, United of Omaha concedes that this twenty-six-year-old reference contains no "hard data" regarding the mortality risk of a person with FSH MD. Similarly, it produces no actuarial data to indicate that the specific complications of Chabner's disease have adverse effects on mortality. Where the record is devoid of actuarial data regarding the mortality rate associated with FSH MD, no reasonable trier of fact could draw an inference that United of Omaha adhered to sound actuarial principles in charging Chabner a rate differential.[14]

■ It is a closer question, however, whether the evidence supports an inference that the rate differential was based on "actu-al and reasonably anticipated experience." The California statute's requirement of actual and reasonably anticipated experience departs from the model statute, which requires "actual or reasonably anticipated experience." See NAIC Model Regulation § 3. United of Omaha does not dispute that it had no actual, internal experience with FSH MD. Therefore, if the statute were read literally, United of Omaha could not prevail under the "experience" prong of section 10144's exception. However, section 10144's exception is read more logically to allow an exception for actual or reasonably anticipated experience.[15]

■ Drawing from the language of the NAIC Model Regulation, the Department of Justice has construed section 501(c)(1) of the ADA to require that the standards an insurer employs to individually underwrite a nonstandard applicant must be " 'based on sound actuarial data and not on speculation.' " 28 C.F.R. Ch. I, Pt. 36, App. B, § 36.212 at 612 (1995) (quoting H.R.Rep. No. 485, 101st

13. Reference number 39 at the end of the chapter is: Walton, J.N., *The Prognosis of Some Neuromuscular Diseases*, Trans. Assur. Med. Soc., 1970, at 13. *See* Defendant's Objections to Declarations in Support of Plaintiff's Motion for Summary Judgment, Ex. B. at 782.

14. The Brackenridge manual describes sound actuarial principles in great detail, but nothing in the record indicates that those principles underlie the extra mortality rating associated with FSH MD. Excerpts from the Brackenridge manual include:
(1) "the underwriter assigns risk to one of the risk classes predetermined through the cooperative efforts of actuaries, medical directors and underwriters. The methodology used *to determine risk classes based on mortality studies from various sources is described in Chapter 4*." Brackenridge manual, at 31 (emphasis added) (Chapter 4 not in the record).
(2) "Simply put, in order for a condition to be viewed as substandard [and subject to a rate increase], mortality observed among those people having the condition must be greater than the mortality otherwise expected. And in order to know what mortality to expect, a reference mortality experience must be available." Brackenridge manual, at 84.
(3) " 'The appropriate ratings for various impairments may be estimated either from the results of previous mortality studies of those impairments, from the experience of the individual life office concerned or from the trend of current clinical opinion regarding the progress of the impairments in question in

light of the developments in therapeutic techniques.' " Brackenridge manual, at 97 (quoting an earlier edition).

15. The NAIC model regulation's language, "actual or reasonably anticipated experience," makes more sense than California's language, "actual and reasonably anticipated experience."

Assuming no actuarial data exist from mortality studies, the "experience" prong of the model regulation allows an insurer to base refusals or rate differentials on data distilled from either its own internal experience or on experience reasonably anticipated from some other information.

California's statute, however, appears to require both actual and reasonably anticipated experience. Literally construed, this would require an insurer not only to have actual experience with the applicant's disability but also to reasonably anticipate the same experience in the future. Such a requirement would place an insurer in a difficult position where data from mortality studies were unavailable and the insurer had no actual experience with the applicant's disability. The insurer would have to choose between commissioning a study to create actuarial data and insuring the applicant at a standard rate, no matter how reasonable it would be to anticipate an increased mortality rate in a population with the applicant's risk profile. For purposes of this motion, the court gives United of Omaha the benefit of the doubt and reads the experience prong to require actual or reasonably anticipated experience.

**1196**

Cong., 2d Sess., pt. 3. at 70 (1990)) (hereinafter, "Judiciary Report"). Both the DOJ and the legislature expressly considered the language of the model regulation's experience prong before requiring that insurers base their underwriting standards on actuarial data. *Id.* Thus, a basis in actuarial data is required under both the actuarial principles and the experience prongs.

United of Omaha, however, has produced no evidence that it relied on actuarial data regarding Chabner's anticipated mortality rate drawn from mortality studies, its own experience, or reasonably anticipated experience. United of Omaha's failure to produce any actuarial data upon which it based the 96.5% rate differential, therefore, precludes it from invoking the exception to section 10144. Chabner is entitled to summary judgment because United of Omaha has failed to produce evidence to rebut Chabner's prima facie case of discrimination based on disability.

*CONCLUSION*

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED.

IT IS SO ORDERED.