Howard L. **CHABNER,**
Plaintiff–Appellee,

v.

**UNITED OF OMAHA LIFE INSURANCE COMPANY,**
Defendant–Appellant.

No. 98–17060.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 2000

Filed Sept. 11, 2000

Horace W. Green and Joel H. Kaplan, Seyfarth, Shaw, Fairweather & Geraldson, San Francisco, CA, for appellant.

Sid Wolinsky, Disability Rights Advocates, Oakland, CA, for appellee.

Bill Lockyer, Attorney General, Sacramento, CA, Kathleen W. Mikkelson, Deputy Attorney General, Oakland, CA, for amicus State of California and Stephen Kanwit, Epstein, Becker & Greene, Washington, DC, for amicus Health Insurance Association of America.

Before: HUG, Chief Judge, D.W. NELSON and McKEOWN, Circuit Judges.

HUG, Chief Judge:

Plaintiff/Appellee Howard Chabner brought suit against Defendant/Appellant United of Omaha Insurance Company ("United") for alleged violations of the Americans with Disabilities Act ("ADA")

and of various California state laws. Chabner, who is disabled, claims that United unfairly discriminated against him by offering him a life insurance policy that substantially overcharged him for any increased mortality risk associated with his disability. The district court held that Chabner had a valid claim under both state law and the ADA, and finding no genuine issue of material fact, the district court granted summary judgment for Chabner. *See Chabner v. United of Omaha Life Ins. Co.*, 994 F.Supp. 1185 (N.D.Cal.1998). The court directed United to issue Chabner a new policy that conformed to its order granting summary judgment. United appeals both the summary judgment and the order requiring modification of the policy.

Upon careful review of the record we have found that no genuine issue of material fact exists, and that summary judgment for Chabner was appropriate. We do not, however, base our decision on the ADA. We instead rest our decision on California law, which provides Chabner with the remedy he seeks for the misconduct he has alleged. We therefore affirm, although not for all of the reasons relied upon by the district court.

## FACTS

Howard Chabner suffers from a progressive condition called facioscapulohumeral muscular dystrophy (FSH MD), a rare form of muscular dystrophy. The condition has confined Chabner to a wheelchair since 1991 and has caused "marked wasting" of his extremities. Chabner takes medication to help control the condition, and his doctor administers annual electrocardiograms to detect any cardiomyopathy that may arise.

On May 3, 1993, Chabner, who was 35 years old at the time, applied to United for whole life insurance.[1] United forwarded Chabner's application to an underwriter who had experience in underwriting insurance policies for applicants with muscular dystrophy, but not with FSH MD. United possessed no internally developed actuarial data for people with FSH MD, and so its underwriter turned to external sources to estimate Chabner's mortality risk. The underwriter, who was not a doctor, arranged to have Chabner examined by a paramedic, reviewed Chabner's medical records, and consulted two underwriting source materials: the Cologne Life Reinsurance Company's "Life Underwriting Manual" ("Cologne manual"); and "Medical Selection of Life Risks" by R.D.C. Brackenridge and W. John Elder ("Brackenridge manual"). After reviewing these materials, the underwriter authorized a policy with a "Table 6" rating, which corresponded to a mortality rate of 150 percent above standard.[2]

United offered Chabner a $100,000 whole life policy at a cost of $1,076 per year. Of the $1,076 annual premium, $305.44 was applied to the cost of insurance, and the remainder was invested in the policy's cash accumulation and surrender values. By contrast, even though the annual premium for a standard whole life policy (without an increased mortality rating) would have been the same $1,076, only $155.44 of that annual premium would have been applied to the cost of insurance, which would result in an additional $150 being invested in the policy's cash accumulation and surrender values each year.

Chabner accepted the policy, but inquired about the reason for his nonstandard premium. United's Vice President and Senior Medical Director of Underwriting sent Chabner a letter attempting to explain the nonstandard rating. In the letter, United acknowledged that FSH MD "has only a small effect on mortality" and stated that it reduced life expectancy by four years for a non-smoking man of his

---

1. A whole life insurance policy is designed to provide both insurance and cash value accumulation.

2. The Brackenridge manual recommended a mortality rate between 75 and 150 percent for slowly progressive FSH MD. The Cologne manual recommended a mortality rate of at least 300 percent.

age. Unsatisfied, Chabner wrote United on two more occasions to inquire why his premium was 96.5% greater than standard if his condition had only a small effect on mortality. United did not respond, and Chabner filed this action.

Chabner filed his original complaint in California Superior Court on January 3, 1995, alleging violations of California's Insurance Code, its Business and Professions Code, its Unruh Civil Rights Act, and common law fraud. After United removed the case to federal court based on diversity jurisdiction, Chabner amended his complaint to add a claim under the ADA.[3] Chabner sought class certification and moved for summary judgment on all but his fraud claim. The district court denied class certification, but granted Chabner's motion for summary judgment. See Chabner, 994 F.Supp. 1185. The district court held that the ADA applies to insurance underwriting, see id. at 1190–93, that California law provides Chabner with

a private cause of action for the alleged violation of the state insurance code, see id. at 1189, and that United's actions in this case violated the ADA, the California Insurance Code and the Business and Professions Code, and the Unruh Civil Rights Act, see id. at 1193–96. In subsequent orders the court denied United's motions for reconsideration and ultimately ordered United to issue Chabner a new policy that conformed to the court's order granting summary judgment. The court dismissed Chabner's remaining fraud claim, pursuant to Chabner's request, and entered final judgment on September 28, 1998. United timely filed its notice of appeal on October 23, 1998. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

### I. The ADA

The district court's interpretation of the ADA is a question of law that we review de novo. See Bay Area Addiction

3. Before Chabner added the ADA claim, the propriety of federal jurisdiction based on diversity may have been questionable. Chabner was a resident of California, and United was a Nebraska corporation with its principal place of business in Nebraska, but it is unclear whether the amount in controversy met the jurisdictional minimum, which was $50,000 when United removed the case in 1995. 28 U.S.C. § 1332(a) (pre–1996 Amendments). Chabner's original complaint sought an injunction preventing United from issuing him a discriminatory policy. The approximate value of this injunction would have been only $150 per year, which would not have been enough to meet the jurisdictional minimum. Chabner's state law claims also authorized treble damages and attorney's fees, Cal. Civ. Code § 52(a), as well as punitive damages. Although the district court could have taken these additional damages into account when determining the amount in controversy, see Galt G/S v. JSS Scandinavia, 142 F.3d 1150, 1156 (9th Cir.1998); Davenport v. Mutual Benefit Health and Accident Ass'n, 325 F.2d 785, 787 (9th Cir.1963), there were no allegations of the amount of damages, and it is unclear whether the jurisdictional minimum would have been met even with these additional damages. Thus, removal jurisdiction based on diversity might not have been proper.

We need not, however, rest federal jurisdiction on this questionable ground. Once in federal court, Chabner amended his complaint to add a claim under the ADA, thereby raising a federal question. Although normally "jurisdiction must be analyzed on the basis of the pleadings filed at the time of removal without reference to subsequent amendments," Sparta Surgical Corp. v. National Ass'n of Sec. Dealers, 159 F.3d 1209, 1213 (9th Cir.1998), that rule applies mainly in cases where the amended complaint attempts to destroy federal jurisdiction after the case has been properly removed, see id. In this case, where the amended complaint solidified rather than destroyed federal jurisdiction, we are guided by Grubbs v. General Electric Credit Corp., 405 U.S. 699, 92 S.Ct. 1344, 31 L.Ed.2d 612 (1972), and Caterpillar Inc. v. Lewis, 519 U.S. 61, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996). Caterpillar reaffirmed that "an erroneous removal need not cause the destruction of a final judgment, if the requirements of federal subject matter jurisdiction are met at the time the judgement is entered." Caterpillar, 519 U.S. at 73, 117 S.Ct. 467 (citing Grubbs, 405 U.S. at 700, 92 S.Ct. 1344). In this case, because the ADA claim raised a federal question, subject matter jurisdiction existed at the time the district court entered judgement. Therefore, this case was properly in federal court.

*Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 730 (9th Cir.1999).

■ Chabner alleges that the nonstandard premium that United charged him for his insurance policy violated the ADA. Recently, however, we held that although Title III of the ADA requires an insurance office to be physically accessible to the disabled, it does not address the terms of the policies the insurance companies sells. *See Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1115 (9th Cir.2000). We therefore hold that United did not violate the ADA by offering Chabner a nonstandard policy.

Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The ADA also includes a "safe harbor" provision, which says that "[the ADA] shall not be construed to prohibit or restrict . . . an insurer . . . from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law. . . ." 42 U.S.C. § 12201(c).

*Weyer,* which was handed down after the district court's order was issued, concerned the question of whether an insurance company that administers an employer-provided disability plan was a "place of public accommodation" under Title III of the Americans with Disabilities Act. We found that the term "place of public accommodation" required a connection between the good or service complained of and an actual physical place. As we explained:

> [c]ertainly, an insurance office is a place where the public generally has access. But this case is not about such matters as ramps and elevators so that disabled people can get to the office. The dispute in this case, over terms of a contract that the insurer markets through an employer, is not what Congress ad-

dressed in the public accommodations provisions.

*Weyer,* 198 F.3d at 1114. In adopting this approach, we followed the Third and Sixth Circuits, each of which agreed that an insurance company that administered an employer-provided .disability plan was not a "place of public accommodation" under the ADA because the employees received their benefits through employment, and not through a public accommodation. *See Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1010–12 (6th Cir.1997) (en banc); *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 612–13 (3d Cir.1998). Taking these cases at face value, we are led to conclude that a similar distinction between "access" and "content" applies to this case. Here, we reiterate our observation, set forth in *Weyer,* that "an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the nondisabled." *Weyer,* 198 F.3d at 1115. Therefore, we do not uphold the district court's decision based upon the ADA.

## II. California Law

■ We review *de novo* the district court's ruling that California law provides Chabner with a private right of action for violation of its Insurance Code. *See Mastro v. Witt,* 39 F.3d 238, 241 (9th Cir.1994) (en banc). We also review *de novo* the district court's grant of summary judgment. *See Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir.1999).

### A. Business and Professions Code section 17200 and Insurance Code section 10144.

In his complaint Chabner alleged violations of California Insurance Code section 10144, and California Business and Professions Code section 17200. Insurance Code Section 10144 provides, in relevant part:

> No insurer issuing [life insurance] shall refuse to insure, or refuse to continue to insure, . . . or charge a different rate for the same coverage solely because of a

physical or mental impairment, except where the refusal . . . or rate differential is based on sound actuarial principles or is related to actual and reasonably anticipated experience. . . .

Cal. Ins.Code § 10144. This statutory provision would have prohibited United from charging Chabner a nonstandard premium due to his FSH MD, unless the premium was based on sound actuarial principles or was related to actual and reasonably anticipated experience. However, it is unclear whether this insurance code section provides Chabner with a private cause of action. The parties did not address this issue in their briefs,[4] and therefore we do not address it.

■ Chabner, however, also claimed violations of California Business and Professions Code section 17200. Section 17200 is part of the Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200—17209, and provides, in relevant part, that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. Private causes of action for violations of Business and Professions Code section 17200 are authorized by Business and Professions Code section 17204. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 71 Cal.Rptr.2d 731, 950 P.2d 1086, 1089 (1998). The district court held that Insurance Code section 10144 may be used to define the contours of a private cause of action under Business and Professions Code section 17200. We agree.

■ The California Supreme Court has held that section 17200 "defines 'unfair competition' very broadly, to include 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 6 Cal. Rptr.2d 487, 826 P.2d 730, 742 (1992) (internal quotation marks omitted) (quoting *Barquis v. Merchant Collection Ass'n*, 7 Cal.3d 94, 101 Cal.Rptr. 745, 496 P.2d 817,

830 (1972)). "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 539–40 (1999) (internal quotation marks omitted). It does not matter whether the underlying statute also provides for a private cause of action; section 17200 can form the basis for a private cause of action even if the predicate statute does not. *See Stop Youth Addiction*, 71 Cal.Rptr.2d 731, 950 P.2d at 1091.

■ There are limits on the causes of action that can be maintained under section 17200. A court may not allow a plaintiff to "plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." *Cel–Tech Communications*, 83 Cal.Rptr.2d 548, 973 P.2d at 541 (internal quotation marks omitted). This limit is rather narrow, however. "To forestall an action under [section 17200], another provision must actually 'bar' the action or clearly permit the conduct." *Id.*

■ As applied to this case, the district court was correct in holding that Chabner could maintain a cause of action under section 17200 for United's alleged violation of section 10144. Setting the premium for a life insurance policy can quite "properly be called a business practice." *Farmers Ins. Exch.*, 6 Cal.Rptr.2d 487, 826 P.2d at 742. Also, United's alleged misconduct (charging Chabner a discriminatory premium that is neither actuarially sound nor based on reasonably anticipated experience) would run afoul of section 10144, if proven. Accordingly, the prerequisites for "borrowing" a violation of section 10144 and treating it as a violation of section 17200 exist in this case. *See Cel–Tech*

---

**4.** In fact, Chabner concedes that "the question of whether there is a private right of action under Insurance Code § 10144 is not properly presented to this Court."

*Communications,* 83 Cal.Rptr.2d 548, 973 P.2d at 540.

Moreover, the narrow limitations on causes of action under section 17200 do not prevent this claim. *See Cel–Tech Communications,* 83 Cal.Rptr.2d 548, 973 P.2d at 541 (holding that to prevent an action based on section 17200, another statutory provision must either permit the challenged conduct or bar the cause of action). First, no statutory provision permits United to charge arbitrarily discriminatory premiums, and United does not dispute this fact. Second, nothing specifically bars this cause of action.

United points to *Moradi–Shalal v. Fireman's Fund Insurance Cos.,* 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58 (1988), and *Manufacturers Life Insurance Co. v. Superior Court,* 10 Cal.4th 257, 41 Cal. Rptr.2d 220, 895 P.2d 56 (1995), to argue otherwise. *Moradi–Shalal* held that Insurance Code section 790.03, which is part of the Unfair Insurance Practices Act ("UIPA"), did not create a private cause of action against an insurer that violated section 790.03(h) (regulating insurers' unfair practices in settling claims). *See Moradi–Shalal,* 250 Cal.Rptr. 116, 758 P.2d at 68. *Manufacturers Life* then held that plaintiffs could not use section 17200 to plead a cause of action based on a violation of section 790.03(h), because to do so would undermine *Moradi–Shalal. See Manufacturers Life,* 41 Cal.Rptr.2d 220, 895 P.2d at 71–72. United argues that these two cases apply here because another subsection of the UIPA, subsection 790.03(f), defines un-

fair rate discrimination[5] and therefore governs United's alleged misconduct in this case. United argues that because private plaintiffs cannot bring a direct cause of action under section 790.03(h), and because they cannot get around that bar by using section 17200, they also cannot do so for violations of section 790.03(f).

United's argument overlooks the fact that Chabner predicates his section 17200 action on a violation of section 10144, not on a violation of section 790.03(f). The two statutes, section 10144 and section 790.03(f), regulate similar types of conduct: charging different premiums for arbitrary reasons. However, even assuming that *Moradi–Shalal* and *Manufacturers Life* prevent causes of action based on section 790.03(f), it does not necessarily follow that they also prevent causes of action based on section 10144. In *Manufacturers Life,* although the court held that the plaintiff could not proceed with a section 17200 claim where the predicate statute was section 790.03(h), it allowed the plaintiff to proceed with a section 17200 claim where the predicate statute was the Cartwright Act, even though the conduct that allegedly violated the Cartwright Act was the same conduct that allegedly violated section 790.03(h). *See Manufacturers Life,* 41 Cal.Rptr.2d 220, 895 P.2d at 71–72.[6] In this case, as in *Manufacturers Life,* "[t]here is no attempt to use [section 17200] to confer private standing to enforce a provision of the UIPA," *id.* at 71, because section 10144, like the Cartwright Act, is not part of the UIPA.[7] Nor is

---

**5.** Section 790.03(f) defines "[u]nfair rate discrimination" as "[m]aking or permitting any unfair discrimination between individuals of the same class and equal expectation of life in the rates charged for any contract of life insurance...."

**6.** The fact that section 790.03 did not provide a private cause of action, whereas the Cartwright Act explicitly provided a private cause of action, was not a factor in the *Manufacturers Life* decision. As the California Supreme Court stated, both before and after *Manufacturers Life,* "whether a private right of action should be implied under [the predicate] statute ... is immaterial" to the question wheth-

er a plaintiff may maintain a section 17200 cause of action based on the predicate statute. *Committee on Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197, 197 Cal. Rptr. 783, 673 P.2d 660, 668 (1983) (footnote omitted); *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,* 17 Cal.4th 553, 71 Cal.Rptr.2d 731, 950 P.2d 1086, 1091 (1998).

**7.** Insurance Code section 10144 was enacted more than 20 years after the UIPA. *Compare* Cal. Ins.Code § 10144 (1980) (amended 1982), *with* Cal. Ins.Code § 790.03 (1959) (amended 1961, 1970, 1972, 1975, 1978, 1983, 1989).

Chabner's cause of action "based on conduct which is absolutely privileged or immunized by another statute." *Id.* at 71–72. As the California Supreme Court has explained, the *Manufacturers Life* court, in construing the UIPA and section 17200, "expressly concluded that in adopting the UIPA the Legislature had not granted a general exemption from antitrust and unfair competition statutes." *Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal.4th 26, 77 Cal.Rptr.2d 709, 960 P.2d 513, 522 (1998). Therefore, section 790.03 and *Moradi–Shalal* do not prevent Chabner from using section 10144 to define the contours of his section 17200 action, and the district court correctly allowed him to proceed with that claim.

### B. The Unruh Civil Rights Act.

Chabner also claims that United's actions violated California's Unruh Civil Rights Act. The Unruh Civil Rights Act provides, in relevant part, that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their ... disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatso-. ever." Cal. Civ.Code § 51. The Act also provides that a violation of the ADA is also a violation of the Unruh Act. Cal. Civ.Code § 51. The district court held that because United had violated the ADA, it also violated the Unruh Act. In light of our decision in *Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104 (9th Cir.2000), as discussed above, the district court's decision cannot be upheld on this basis.

▮ We may, however, "affirm the district court on a ground not selected by the district judge so long as the record fairly supports such an alternative disposition." *Fidelity Fin. Corp. v. Fed. Home Loan Bank,* 792 F.2d 1432, 1437 (9th Cir.1986). Chabner, and the State of California as amicus curiae, argue that United's actions violated the Unruh Act, regardless of whether they also violated the ADA. We agree that Chabner's allegations support an Unruh Civil Rights Act claim independently of the alleged ADA violation.

▮ The Unruh Civil Rights Act works to ensure that all persons receive the full accommodations of any business within California, regardless of the person's disabilities. Cal. Civ.Code § 51. The insurance business is subject to the Unruh Civil Rights Act. Cal. Ins.Code. § 1861.03(a). Unruh prevents more than discrimination in access to a business or its services; it also prevents discrimination in the form of pricing differentials. *See Koire v. Metro Car Wash,* 40 Cal.3d 24, 219 Cal.Rptr. 133, 707 P.2d 195, 197 (1985). However, disparities in treatment and pricing that are reasonable do not violate the Unruh Act. *See id.* (stating that "certain types of discrimination have been denominated 'reasonable' and, therefore, not arbitrary"). The critical question, therefore, is whether the nonstandard premium United charged Chabner was "reasonable."

To determine whether the nonstandard premium was reasonable, we are again informed by Insurance Code section 10144. Section 10144 prevents an insurer from charging "a different rate for the same coverage solely because of a physical or mental impairment," unless the "rate differential is based on sound actuarial principles or is related to actual and reasonably anticipated experience." Cal. Ins.Code § 10144. If Chabner's nonstandard premium was based on "sound actuarial principles" or "actual and reasonably anticipated experience," then it would certainly be reasonable for purposes of the Unruh Act because it would have been specifically allowed by statute. By contrast, if the premium was not based on one of the section 10144 prongs, then there would be no reasonable justification for it, and in that case we may consider the nonstandard premium to be arbitrary and a violation of the Unruh Act. Therefore, we hold that if United violated Insurance Code section 10144, it also violated the Unruh Act, but if section 10144 authorized United's

actions, then Chabner's Unruh Act claim necessarily fails as well.

## C. *Primary Jurisdiction.*

 United argues that even if we agree that Chabner may sue under section 17200 for the alleged violations of section 10144, and that even if Chabner has a claim under the Unruh Civil Rights Act, we should nevertheless apply the doctrine of primary jurisdiction to stay the underlying action. Primary jurisdiction may apply when a claim is originally cognizable in the courts, but is also subject to a regulatory scheme that is enforced by an administrative body of special competence. *See Farmers Ins. Exch. v. Superior Court,* 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730, 738–39 (1992). The doctrine gives courts discretion to stay the proceedings, pending referral of the issues to an administrative body. *See id.* United argues that, under the doctrine, we should vacate the district court's order and stay the proceedings, pending referral to the California Insurance Commissioner of the question whether the nonstandard premium was based on "sound actuarial principles" or "actual and reasonably anticipated experience."

 We are not persuaded by United's primary jurisdiction argument. In federal and California state courts, "[n]o rigid formula exists for applying the primary jurisdiction doctrine." *Farmers Ins.,* 6 Cal. Rptr.2d 487, 826 P.2d at 739; *see United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Rather, resolution hinges on the extent to which the application of the doctrine would serve two underlying policies. *See Farmers Ins.,* 6 Cal.Rptr.2d 487, 826 P.2d at 739. Those policy considerations are: 1) whether application will enhance court decision-making and efficiency by allowing the court to take advantage of administrative expertise; and 2) whether application

will help assure uniform application of regulatory laws. *See id.*

 In this case, vacating the district court's order and referring the matter to the Insurance Commissioner would not serve the dual policies of primary jurisdiction. First, it is important to note that United did not seek application of the primary jurisdiction doctrine until after the district court had already found that the nonstandard premium violated Insurance Code section 10144.[8] Staying the proceedings at that late date, much less now, would hardly have enhanced the district court's efficiency, nor would it have taken advantage of the Insurance Commissioner's expertise, given that the district court had already decided that the premium was not actuarially sound. Second, given that each case of alleged arbitrary rate setting by insurance companies raises many different factual issues (for example, the age of the applicant, the types of any disabilities, whether the applicant is a smoker, etc.), and given that this case in particular involves an extremely rare ailment, there would have been little uniformity to gain by referring this matter to the Insurance Commissioner. Thus, the policies underlying primary jurisdiction would not be served by its application in this case, and we decline United's invitation to invoke it here. Therefore, we now turn to the question whether the premium was based on sound actuarial principles or actual and reasonably anticipated experience.

## D. *Summary Judgment.*

As discussed earlier, even though Chabner's state law causes of action arose under Business and Profession Code section 17200 and the Unruh Civil Rights Act, the standards of liability for each of these claims are set by Insurance Code section 10144. Under section 10144, a nonstandard premium is lawful only if it meets one

8. Chabner argues that United waived its primary jurisdiction argument because it failed to raise it until after the district court had granted Chabner summary judgment. We need not decide this issue because we instead reject United's primary jurisdiction claim on the merits.

of two prongs: it must be "based on sound actuarial principles," or it must be "related to actual and reasonably anticipated experience." Cal. Ins.Code § 10144.

■ The parties argue at length about the proper definitions of "sound actuarial principles" or "actual and reasonably anticipated experience." For example, they dispute whether an insurance company must base its rating decisions on "hard data" that is specific to each person, or whether it may take into account more generalized estimates of mortality when it lacks specific data. We need not resolve the debate about exactly what can justify a mortality decision as actuarially sound or related to actual and reasonably anticipated experience, for in this case there is no question that United's mortality rating was arbitrarily high.

The mortality rating United assigned to Chabner was not actuarially sound. United assigned Chabner a "Table 6" rating, which corresponds with a 150% mortality rating. The 150% mortality rating, in turn, reflects an estimate that Chabner's life expectancy is nine to eleven years less than that of a standard male non-smoker. United points to the Brackenridge manual, which recommended a mortality rating of 75%—150%, and the Cologne manual, which recommended a mortality rating of 300%, to argue that the 150% mortality rating was justified. However, United's own admissions subvert its reliance on these manuals. In his letter to Chabner, Dr. Robert Quinn, the Vice President and Senior Medical Director of Underwriting at United, admitted that FSH MD "has only a small effect on mortality." More-

over, Dr. Quinn estimated Chabner's life expectancy to be only four years less than standard. Even assuming that the estimate of a four year decrease in life expectancy is correct,[9] it does not justify a rating that estimates a nine to eleven year decrease.[10] Accordingly, by United's own admission, the 150% mortality rating (i.e., the estimate of a nine to eleven year decrease in life expectancy) was not actuarially sound.

Nor does the second prong of section 10144, which allows rate differentials if they are based on actual and reasonably anticipated experience, provide refuge for the 150% mortality rating. United's underwriter handling Chabner's application had experience with muscular dystrophy, but not with Chabner's rare fascioscapulohumeral muscular dystrophy. She thus had no "actual experience" with underwriting applicants with FSH MD. Moreover, she was not a doctor, she did not have a doctor examine Chabner, and she did not have a doctor review Chabner's medical records. Thus, the underwriter's basis for "reasonably anticipated experience" in evaluating an applicant with FSH MD was virtually nonexistent, especially considering that Dr. Quinn, who was a medical doctor and who was familiar with FSH MD, subsequently admitted that FSH MD has little effect on mortality. Therefore, viewing the evidence in the light most favorable to United, we hold that no reasonable jury could find that the 150% mortality rating was either based on sound actuarial principles or related to actual and reasonably anticipated experience. Sec-

9. The estimated four year decrease in life expectancy is itself questionable, given that Chabner has submitted numerous excerpts from medical manuals that indicate FSH MD does not decrease life expectancy. However, because we view the evidence in the light most favorable to United, we will assume the estimated four year decrease is more accurate than the estimated zero year decrease. Nevertheless, this does not change our conclusion—an estimate of a four year decrease in life expectancy does not justify a mortality rating with a nine to eleven year decrease.

10. More than two years after Dr. Quinn sent Chabner the letter with his estimate of a four year decrease in life expectancy, he submitted a declaration to the district court that stated that when he wrote the letter he had no personal knowledge of the life expectancy associated with a Table 6 rating. Although the purpose of this declaration is to discount his earlier estimate of a four year decrease in life expectancy, it does not overcome his admission that FSH MD has only a small effect on mortality, even if we view the declaration in the light most favorable to United.

tion 10144 did not justify the discriminatory premium, and summary judgment on Chabner's Business and Professions Code section 17200 claim, and on his Unruh Civil Rights Act claim, was therefore proper. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248—50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that summary judgment is appropriate if no reasonable fact finder could return a verdict for the nonmoving party).

### E. The Modification Order.

 After it granted summary judgment for Chabner, the district court ordered United to modify the policy it offered Chabner such that the policy would conform with the court's order granting summary judgment. United argues that the district court erred by ordering this modification, because the court did not specify what premium United should charge Chabner. We review the district court's order to modify the insurance policy, an equitable remedy, for abuse of discretion. *See United States v. Washington,* 157 F.3d 630, 643 (9th Cir.1998); *Diaz v. San Jose Unified School District,* 861 F.2d 591, 595 (9th Cir.1988). It was not an abuse of discretion.

The district court order merely requires United to issue Chabner a policy that conforms with its order granting summary judgment—i.e., one that is based on sound actuarial principles or actual and reasonably anticipated experience. This injunctive relief is fully authorized by California law. Cal. Bus. & Prof.Code § 17203; Cal. Civ.Code § 52(c).[11] To comply with this order United may either issue Chabner a policy with a standard premium, or it may charge him a nonstandard premium that does conform with section 10144. In any event, giving United this choice is not an abuse of discretion in this case, and we therefore affirm the district court's order.

### CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment for Appellee Chabner, and its judgment ordering Appellant United to modify the insurance policy, are AFFIRMED.

---

11. The district court's award of statutory damages in the amount of $1,000, and its award of attorney's fees, are also fully supported by California law. Cal. Civ.Code § 52(a).