## LEONARD F., Plaintiff.

v.

## ISRAEL DISCOUNT BANK OF NEW YORK, and Metropolitan Life Insurance Company, Defendants.

### No. 95 Civ. 6964(CLB).

United States District Court,
S.D. New York.

June 26, 1997.

Robert Schonfeld, Stein & Schonfeld, Garden City, Cary Lacheen, Edward Copeland, N.Y. Lawyers for the Public Interest in, New York City, for Leonard F.

Paula Feinberg, Law Office of Theodore Itzkowitz, New York City, for defendant Israel Discount Bank of N.Y.

Allan M. Marcus, Lawrence Wolff, MET-LIFE, New York City, Joel Kaplan, Seyfarth Shaw Fairweather & Geraldson, Chicago, IL, for Metropolitan Life Insurance Company.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

By motions argued and fully submitted on April 24, 1997, Defendant Israel Discount Bank of New York ("the Bank") moves pursuant to Rule 12(b)(6), Fed.R.Civ.P. 12(b)(6) to dismiss Plaintiff's second claim pleaded against it under Title III of the Americans With Disabilities Act of 1990 ("the ADA"), and Defendant Metropolitan Life Insurance Company ("Met Life") moves pursuant to Rule 12(b)(6), Fed.R.Civ.P. 12(b)(6), to dismiss Plaintiff's claim pleaded against it under Title III of the ADA.

The following facts are conceded for purposes of the motions. On September 14, 1987, the Bank hired Leonard F. as an Assistant Vice President. As a fringe benefit of his employment, the Bank provided him with short and long term disability insurance coverage through Defendant Met Life ("the Plan"). On or about April 19, 1994 Leonard F. became disabled as a result of depression, a "mental, psychoneurotic or personality disorder" within the terms of the Met Life Policy. He allegedly remained disabled and has not returned to work at the Bank since that date.

Leonard F. received short-term disability benefits under the Bank's short-term disability plan, which was a prerequisite to obtaining long-term disability benefits. He then applied for long-term disability benefits under the Bank's long-term disability insurance plan, which was provided by Met Life. In December of 1994, Met Life, the Bank's long-term disability insurer, determined that Leonard F. had a disability, and his claim for long-term disability benefits was accepted and approved retroactive to October of 1994.

The long-term disability coverage provided by Met Life for mental disorders is limited to two years of benefits, and in October 1996 payments were terminated. Had Plaintiff's disability been physical in nature, long-term insurance benefits would have continued until he reached the age of 65 (in the year 2009) or until he became cured.

On March 22, 1995 Plaintiff filed charges of discrimination against the Bank with the New York Regional Office of the Equal Employment Opportunity Commission ("EEOC") on the sole basis that the Plan's two year mental disorder limitation provision violates Title I of the ADA (Amended Complaint, ¶ 21). On June 6, 1995, the EEOC issued a "right to sue" letter on the charge that Plaintiff filed against the Bank (Amended Complaint, ¶ 23). As a result, Plaintiff filed the initial Complaint in this action asserting one claim and seeking a declaration: (1) that he is a "qualified individual with a

disability"; and (2) that the benefit limitations for mental disorders contained in the Plan violate Title I of the ADA (Amended Complaint, "Wherefore" clauses, 1 & 2).

By motion granted November 22, 1996 over opposition, Plaintiff was authorized to amend the Complaint to add Met Life as a party defendant and to assert an ADA Title III claim against both Met Life and the Bank. This Court granted the motion without reaching the merits because leave to amend should be freely granted.

*The Bank's Motion to Dismiss the Second Claim Pleaded in the Amended Complaint.*

■ The Court must determine the legal viability of Plaintiff's claim presuming the truth of the facts alleged in the Complaint. *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

■ Title III of the Americans With Disabilities Act of 1990 (42 U.S.C. § 12182(a)) upon which the Second Claim is based, provides:

> "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privilege, advantages or accommodations *of any place of public accommodation* by any person who owns, leases (or leases to) or operates a place of public accommodation." (Emphasis added).

Title III contains no reference to employment practices. The legislative history of the ADA confirms that Title III, as its plain meaning tells us, was intended to regulate owners and lessees of places of public accommodation, and not equality in conditions or terms of employment. "Title III is not intended to govern any terms and conditions of employment by providers of public accommodations ... employment practices are governed by Title I." S.Rep. No. 116, 101st Cong., 1st Sess. 58 (1989).

The Bank does not dispute that its office is a place of public accommodation under Title III for purpose of customers making deposits and withdrawals. However, Plaintiff's grievance does not extend to the goods, services and facilities which the Bank provides to its customers, nor does Plaintiff claim that he was denied (equal) access to any of the Bank's services provided to the public. Plaintiff instead asserts that the Bank discriminated against him in the terms and conditions of a benefit provided to him in his health insurance because his disorder was mental rather than physical. This is an employment action and does not implicate the bank's role as an owner of a place of public accommodation.

Plaintiff relies on *Carparts Distribution Center v. Automotive Wholesaler's Ass'n of New England,* 37 F.3d 12, 17–18 (1st Cir. 1994) to support his contention that Title III applies to more than mere places, in the sense of physical structures. That opinion concedes that the issue is one of first impression and purports to find an ambiguity in the statute because one can avail himself or herself of services, such as a travel service, by telephone, without entering the physical premises of the travel agent, and that Congress could not have intended an absurd result. The First Circuit also proposes as an example of a Title III violation, the maker of tools, whose retail stores are easily accessible to disabled persons, but whose products have not been redesigned to be used by "persons with only quite limited disabilities." This decision, which is not binding precedent in this Court, is essentially *dictum* which flies in the face of the plain meaning of Title III and is not supported by the legislative history. The word "services" in the statute clearly is modified and limited by the words "of any place of public accommodation".

The lofty words of the First Circuit in *Carparts* are limited and tempered by the following:

> "We think that at this stage it is unwise to go beyond the possibility that the plaintiff may be able to develop some kind of claim under Title III even though this may be a less promising vehicle in the present case than Title I. Not only the facts but, as we have already noted, even the factual allegations are quite sparse. In addition, because of our resolution of the Title I claims, this case must be remanded and is subject to further proceedings regardless of whether Title III remains in the case. While it is tempting to seek to provide

further guidance, the nature of the record and the way the issues are addressed in the appellate briefs make it imprudent to do so."

Id. at 20.

In *Parker v. Metropolitan Life Insurance Co.*, 99 F.3d 181 (6th Cir.1996), the panel opinion did hold that the statutory language of Title III is sufficiently broad to prohibit discrimination in the contents of insurance products, and not just physical access to insurance company offices. By an Order dated February 6, 1997, reported at *In re Javens*, 107 F.3d 359 (6th Cir.1997), the Sixth Circuit vacated the panel opinion and voted to rehear the *Parker* case en banc. Reargument was set for June 11, 1997, but no decision has been reported as yet. We assume rehearing was not granted in order to bless the result of the panel opinion, now vacated, and decline to rely on it.

The allegations in the Amended Complaint do not support Plaintiff's claim of discrimination against the Bank under Title III of the ADA. Accordingly, the Bank's motion is granted.

*Met Life's Motion to Dismiss the Complaint*

■ Plaintiff alleges that providing a time limitation on long-term disability benefits for individuals with mental disorders, not imposed with respect to physical disorders, under the terms of the Plan and Met Life's Group Policy which secures the benefits granted under the Plan. constitutes illegal discrimination under Title III of the ADA. Congress meant to protect providers insurance and their practice of providing different levels of benefits for individuals with physical and mental conditions (as a risk classification practice). The ADA does not, nor was it ever intended to regulate the business of insurance, and for that reason it includes an explicit "Safe Harbor" provision shielding traditional insurance risk classification practices from regulation under the ADA.

■ The Safe Harbor provision (Section 501(c), 42 U.S.C. § 12201(c), in Title V of the ADA) provides that "Subchapters I through III of this chapter and Title IV of the Act *shall not be construed to prohibit or restrict* ... an insurer ... or similar organizations *from underwriting risks, classifying risks or administering such risks that are based on or not inconsistent with state law.*" (Emphasis added). There are no ambiguities in the plain meaning of this provision of the ADA, and the legislative history of the safe harbor provision supports a conclusion that Title III is not intended to regulate the business of private insurance carriers.

In its report concerning the ADA, and Title III in particular, the Senate Labor and Human Resources Committee stated that, "[s]ince there is some uncertainty over the possible interpretations of the language contained in Titles I, II, III as it applies to insurance, *the Committee added section 501(c) to make it clear that this legislation will not disrupt the current nature of insurance underwriting* or the current regulatory structure for self-insured employers or *of the insurance industry in sales, underwriting, pricing administrative and other services, claims, and similar insurance related activities based on classification of risks as regulated by the States.*" (S.Rep. No. 116, 101st Cong., 1st Sess. 84–86 (1989)(emphasis added)). The Safe Harbor provision of the ADA must also be understood in the context of the McCarran–Ferguson Act. This Act says that "no Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such [federal] Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

Providing a time limitation on benefits for persons with mental disorders while not doing so for persons with physical disorders is consistent with state insurance law and prior underwriting practice. Employers are free to negotiate for any policy they want to for the support of their benefit plans, or no policy. Insurance regulation is reserved to the states, and the ADA expressly provided that no risk classification violates the ADA unless it is "inconsistent with State law." The lawfulness of providing such time limitations upon benefits for mental conditions is supported by tradition and common sense. The foreseeable average length and cost of treatment for a physical disorder can be the subject of actuarial prediction, as is the sta-

tistical frequency of such disorders. Mental disorders are highly individualized, less capable of quantitative assessment, and the decisions of professionals to prolong treatment are less susceptible to objective review.

 Section 501(c) of 42 U.S.C. § 12201 provides that the Safe Harbor clause cannot be used "as a subterfuge to evade the purposes of subchapters I and III of this chapter." Met Life's policy provision concerning mental disability does not violate Title III, and the implementation of and reference to the Safe Harbor clause is not a subterfuge of the purposes of the ADA. The Supreme Court decision in *Public Employees Retirement System of Ohio v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), and the recent decisions of *Modderno v. King,* 82 F.3d 1059 (D.C.Cir.1996), and *Krauel v. Iowa Methodist Medical Center,* 95 F.3d 674 (8th Cir.1996), support the conclusion that Met Life has not engaged in subterfuge as defined by the statute. In *Betts,* the Court defined *subterfuge* as defined in the Age Discrimination in Employment Act as a "scheme, plan, stratagem or artifice of evasion." The D.C. Circuit Court of Appeals in *Modderno* and the 8th Circuit Court of Appeals in *Krauel* applied the holding of *Betts* to the ADA. That Court concluded that Congress intentionally used the word "subterfuge" to mean the same thing in both the ADA and the AEDA. In this case, Met Life's policy restrictions were not acts of subterfuge, for they were not adopted to evade the purposes of the ADA. The policy existed in this form long before the ADA was enacted in 1990.

 Finally, Title III of the ADA is not applicable to employee benefits. As discussed above, with respect to the Bank's motion, the plain meaning and legislative history of the ADA makes clear that claims of discrimination in employee benefits are covered by Title I, not Title III.

The motions are granted. The Court declines at this time to make the finding contemplated by Rule 54(b) of the Federal Rules of Civil Procedure. A status conference will be held on September 18, 1997 at 8:45 A.M.

SO ORDERED.