Susan WINSLOW, Plaintiff,

v.

IDS LIFE INSURANCE CO., Defendants.

No. CIV. 3–96–75 (MJD/AJB).

United States District Court,
D. Minnesota.

Sept. 30, 1998.

**558**

Roderick J. Macpherson III, Minnesota Disability Law Center, Minneapolis, MN, for Plaintiff.

John D. Thompson, Doreen A. Mohs, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, MN, Carol Elizabeth Guy, Guy Law Office, Minneapolis, MN, Gary R. Irwin, American Express Financial Corp., Minneapolis, MN, for Defendants.

## MEMORANDUM AND ORDER

DAVIS, District Judge.

Susan M. Winslow filed this action for declaratory and injunctive relief and for damages under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.01 *et seq.* when she applied for and was denied long-term disability insurance by IDS Life Insurance Co. due to her current history of treatment for a mental health condition. The matter is before the Court on Defendant's motion for summary judgment which, for the foregoing reasons, is denied in part and granted in part.

## BACKGROUND

On approximately October 27, 1994, Plaintiff Susan Winslow applied to IDS Life Insurance Co. for standard long-term disability insurance or, in the alternative, long-term disability insurance with a rider excluding coverage for periods of disability due to her mental health condition. Plaintiff indicated on her application that she had been treated for mental illness—dysthymia or mild depression [1]—within the past year and was currently taking Zoloft, an anti-depressant. IDS refused both requests for insurance based on its policy of automatically denying long-term disability insurance to applicants who report having received treatment for a mental or nervous condition, regardless of seriousness,· within the twelve months prior to application. IDS policy allows such applicants to be reconsidered for long-term dis-

---

1. Dysthymia is a mental condition characterized by mild, chronic depression that is treatable with medication and counseling and is recognized as a disorder in both the *Diagnostic and Statistical Manual of Mental Disorders* and *Paul Revere Underwriting Manual.* (Plaintiff's Mem. Opp. Summ. J. at 3).

ability insurance after a year has passed since their last treatment for a mental or nervous condition. IDS asserts that its above-stated policy is based on industry-wide claims experience and actuarial data that indicates that the highest number of payments are made for depression-related claims. Plaintiff notes, however, that the IDS policy differs from that in the *Paul Revere Underwriting Manual*-a manual used by IDS in making other underwriting decisions-which does not require automatic rejection of applicants with current histories of mental or nervous conditions, such as Plaintiff's dysthymia, but instead provides for a long-term disability insurance policy with a longer exclusion period. (Plaintiff's Mem. Opp. Summ. J. at 4).

Plaintiff received notice of the denial of her long-term disability insurance application in November 1994 and requested reconsideration. In her request for reconsideration Plaintiff asserted to IDS that she had never been hospitalized or missed work due to her mental health condition and provided corroborative letters from two psychiatrists from whom she had received treatment, affirming that Plaintiff suffered only mild symptoms, which did not manifest themselves in work situations. Plaintiff also submitted to IDS letters of support from former and current employers praising her work performance. IDS received Plaintiff's additional documents, and after internal discussions, agreed that denial of Plaintiff's application was appropriate.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate if the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992); *Aucutt v. Six Flags Over Mid-*

*America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996). The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party. Fed.R.Civ.P. 56(b); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. To defeat summary judgment when a properly supported motion for summary judgment is made, however, the non-moving party must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

### II. Disability Under the ADA

■ In order to defeat summary judgment plaintiff Winslow must demonstrate that she is a person with a disability as defined by the ADA and therefore a plaintiff covered by the ADA. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). Winslow does not argue that she meets criteria (A) or (B) of the ADA definition. Instead, Plaintiff asserts that IDS regarded her as disabled and treated her as having "a physical or mental impairment that substantially limits one or more of the major life activities," in this case, her future ability to work. *See, Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995), (citing 29 C.F.R. § 1630.2(1)(3)).

The relevant Equal Employment Opportunity Commission ("EEOC") regulations define "regarded as having an impairment" as:

(i) having a physical or mental impairment that does not substantially limit major life activities but that is treated by a private entity as constituting such a limitation; (ii) having a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; (iii) having none of the impairments defined in . . . [above] but treated by a private entity as having such an impairment.

*Aucutt*, 85 F.3d at 1319–1320 (citing 28 C.F.R. § 1630.2(1)-(3)). Both the ADA and

EEOC regulations establish that a plaintiff, such as Winslow, whose claim asserts only that she was regarded by a defendant as having a substantially limiting impairment, need not prove that she in fact suffered such impairment. As a result, although both parties present conflicting views as to whether Winslow's dysthymia falls within the ADA definition of "impairment," this Court need not reach the question and requires only that Plaintiff demonstrate that she was "regarded as having such an impairment" by IDS, as she so asserts.

Plaintiff claims that the "major life activity" that Defendant perceives as "substantially limited" by her dysthymia is her future ability to work. It is undisputed that work is a "major life activity," which if substantially limited or regarded as substantially limited by a significant impairment qualifies a person as disabled under the ADA. *Wooten.* 58 F.3d at 385, (citing 29 C.F.R. § 1630.2(i)); *see also Thompson v. Holy Family Hospital,* 121 F.3d 537, 541 (9th Cir.1997), (citing *Gordon v. E.L. Hamm & Assocs., Inc.,* 100 F.3d 907, 913 (11th Cir.1996)).

This Court finds, as a matter of law, that when IDS denied Plaintiff Winslow's application for long-term disability insurance based on her depression and anxiety, diagnosed as dysthymia, IDS implicitly considered her to be "impaired" and likely unable to perform "either a class of jobs or a broad range of jobs in various classes" in the future. The Court finds that although no IDS documentation explicitly indicates that Plaintiff was regarded as disabled, perceptions regarding an applicant's future inability to work are the only logical criteria upon which denial of long-term disability insurance, which insures only against the loss of income caused by the inability to work due to a disability, would be based. The Court's finding is supported by Defendant's explanation for its eligibility criteria—that highest payments are going out for claims due to mental or nervous conditions.

■ Defendant asserts that even if Plaintiff can show that IDS regarded her as likely to suffer a substantially limiting impairment in the future, she has failed to show that IDS regarded her as disabled at the time it de-nied her application for long-term disability insurance as required by the statutory language of the ADA, which contains no future tense. See 42 U.S.C. § 12102(2)(C) ("regarded as *having* such an impairment")(emphasis added). In support of its narrow reading of the "regarded as" provision of the ADA, Defendant cites *Glidden v. County of Monroe,* 950 F.Supp. 73, 77 (W.D.N.Y.1997)(defendant's fear that plaintiff would suffer from a mental disability in the future did not render the ADA applicable) and *Pater v. Deringer Mfg. Co.,* 1995 WL 530655 (N.D.Ill.) (the court was "not persuaded by Plaintiff's contention that the perception or fear that a future disability may occur should render the ADA applicable"). The courts in both *Glidden* and *Pater,* however, determined that plaintiffs had failed to make the threshold showing that defendants perceived that they suffered or would suffer disabilities. Therefore, determination as to whether the ADA would have applied to the defendants' hypothetical fear of a plaintiffs' future disabilities was merely dicta.

In *Doukas v. Metropolitan Life Insurance Company,* 1997 WL 833134 (D.N.H.), the court held that "the distinction between present and future limitations [in the ADA] is not dispositive." 1997 WL 833134 at *5. In *Doukas,* Plaintiff Susan Doukas applied for and was denied mortgage disability insurance by MetLife. MetLife based its denial on information in Doukas' application indicating that she had been diagnosed with and was being treated for bipolar disorder and was therefore likely to become totally disabled from work in the future. MetLife moved for summary judgment on the grounds that Doukas did not fall within the ADA definition of disabled because she was not regarded as currently disabled and incapable of working but rather as presenting a future risk of disability. The court denied MetLife's motion, finding that "the 'regarded as' definition of disability seeks to eradicate discrimination based on prejudice or irrational fear. Fear, almost by definition, refers not to actual present conditions, but to anticipated future consequences." *Id.* at *4. Courts have noted that the perception of impairment is included by Congress within the definition of disabled

to combat the effects of " 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Wooten,* 58 F.3d at 385 (citing *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 279 & 285, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). In this light, the *Doukas* court noted that to limit ADA protection to instances in which the defendant regards the plaintiff's substantially limiting impairment as immediate would contradict Congressional intent and "allow an employer to refuse to hire an epileptic as long as the job applicant was not having a seizure at the time." *Doukas,* at *4.[2]

This circuit has not addressed the question of whether the ADA definition of perceived impairment requires that a defendant regard a plaintiff as having a present substantially limiting impairment or whether the statute is satisfied by a defendant's perception of likely future inability to perform a major life activity. This Court finds the reasoning set forth in *Doukas* persuasive and holds that the purpose of the ADA requires that ADA protection extend to cover perception of possible future disability.

### III. Applicability of the ADA to Insurance Policies

Title III of the ADA provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Section 12181(7) provides an illustrative list of entities considered public accommodations for the purposes of Title III. *See Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1010 (6th Cir.1997);

*Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12, 19 (1st Cir.1994). The issue before this Court is whether "public accommodations" are limited to actual physical structures or whether Title III of the ADA prohibits more than physical impediments to public accommodations for the disabled. This issue is one of first impression for the Eighth Circuit and has been decided only by the First and Sixth Circuits, which split on the matter, and a smattering of district courts, some of which have followed the First Circuit in *Carparts* and others of which have adopted the reasoning of the Sixth Circuit in *Parker.*

In *Parker,* the Sixth Circuit reviewed the regulations applicable to Title III of the ADA to interpret "places" of public accommodation and found that a "place," as defined by 28 C.F.R. § 36.104, is "a facility, operated by a private entity, whose operations affect commerce and fall within at least one of the twelve 'public accommodation' categories." *Parker,* 121 F.3d at 1011. A "facility," in turn, is defined by 28 C.F.R. § 36.104 as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." *Parker,* 121 F.3d at 1011. The court concluded that the plain meaning of the statutory language and the applicable regulations is that places of public accommodation are limited to physical places open to public access. *Id.* at 1011, 1014. *See also Erwin v. Northwestern Mutual Life Insurance Company,* 999 F.Supp. 1227, 1231 (S.D.Ind.1998); *Pallozzi v. Allstate Life Insurance Company,* 998 F.Supp. 204, 1998 WL 139410 at *2–*3 (N.D.N.Y.); *Leonard F. v. Israel Discount Bank of New York,* 967 F.Supp. 802, 805

---

**2.** The *Doukas* court noted that courts have avoided construing narrowly the "regarded as" definition of the ADA, citing *Cook v. Rhode Island Dept. of Mental Health, Retardation, and Hosps.,* 10 F.3d 17 (1st Cir.1993), in which the court upheld a finding of perceived impairment based in part on an employer's fear that plaintiff's obesity created a heightened risk of future heart attack, and *Doe v. New York Univ.,* 666 F.2d 761 (2d Cir.1981), in which the court held that NYU regarded plaintiff as impaired when it refused to readmit a plaintiff who it determined posed "an unacceptable risk to faculty, students, and patients." *Doukas* at *5 (citing *Doe,* 666 F.2d at 775).

(S.D.N.Y.1997); *Pappas v. Bethesda Hosp. Ass'n,* 861 F.Supp. 616, 620 (S.D.Ohio 1994).

In *Carparts,* the First Circuit reached the opposite conclusion, determining that "public accommodations" are not limited to actual physical structures. *Kotev v. First Colony Life Insurance Company,* 927 F.Supp. 1316 (C.D.Cal.1996) followed the *Carparts* holding and addressed the issue at greater length. *Kotev* noted that the limited interpretation of "public accommodation" adopted by the *Parker* court would contravene the broadly stated purpose of the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities ... and invoke the sweep of congressional authority ... in order to address the major areas of discrimination faced day-to-day by people with disabilities." *Kotev,* 927 F.Supp. at 1321 (citing 42 U.S.C. § 12101(b)(1, 4)); *See also Doukas v. Metropolitan Life Insurance Company,* 950 F.Supp. 422, 427 (D.N.H.1996).

"Disability" under the ADA includes both physical and mental impairments as well as those with records of or regarded as having such impairments. *See* 42 U.S.C. § 12102(2)(A)-(C). By restricting "public accommodations" to include only physical structures, the protection under the ADA for individuals with mental disabilities would be virtually negated, absent circumstances in which a physical structure denied access to the mentally impaired. *Kotev,* 927 F.Supp. at 1322.

Especially relevant to the present case is ADA statutory language that would be rendered irrelevant if Title III were held to apply only to physical access to public accommodations:

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary ...

(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities ...

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence.

42 U.S.C. § 12182(b)(2)(A)(i-iii); *see also, Doe v. Mutual of Omaha Insurance Company,.* 999 F.Supp. 1188, 1193 (N.D.Ill.1998); *Doukas,* 950 F.Supp. at 426 (D.N.H.1996); *Cloutier v. Prudential Ins. Co.,* 964 F.Supp. 299, 302 (N.D.Cal.1997); *Chabner v. United of Omaha Life Insurance Company,* 994 F.Supp. 1185, 1190 (N.D.Cal.1998); *Kotev,* 927 F.Supp. at 1322. Also rendered superfluous by such a narrow interpretation would be the Title III provision for injunctive relief set forth in 42 U.S.C. § 12188(a)(2) that "shall also include requiring the ... modification of policy."

Further supporting the conclusion reached by *Kotev* and a growing number of district courts—that ADA Title III applies to the provision of insurance policies—is the "Safe Harbor" provision of Title III, specifically addressing insurance. If Title III were not intended to apply to insurance policies, the Safe Harbor provisions would also be superfluous. The Safe Harbor provision states, in relevant part:

Subchapters I through III of this chapter and Title IV of this Act shall not be construed to prohibit or restrict-

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law;

· · ·

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter.

42 U.S.C. § 12201(c). Courts have concluded, and this Court agrees, that the Safe Harbor provision would be superfluous if "insurers could never be liable under Title III for conduct such as discriminatory denial of

insurance coverage." *Kotev,* 927 F.Supp. at 1322; *see also, Chabner,* 994 F.Supp. at 1190–1191.

The interpretation of Title III set forth in the legislative history of the ADA as well as by the U.S. Department of Justice ("DOJ") also supports the theory that Title III of the ADA is intended to cover access to insurance policies offered by public accommodations. The DOJ interprets Title III as prohibiting "differential treatment of individuals with disabilities in insurance offered by public accommodations unless the differences are justified." *Doukas,* 950 F.Supp. at 427 (citing 28 C.F.R. pt. 36, subpart B, § 36.212); *see also Doe v. Mutual of Omaha Insurance Company,* 999 F.Supp. at 1194. Both the Senate and the House have determined that said justification must "be based on sound actuarial principles or be related to actual or reasonably anticipated experience." *Kotev,* 927 F.Supp. at 1323 (citing H.R.Rep. No. 485, 101st Cong., 2d Sess. at 71, U.S.C.C.A.N. at 353; S.Rep. No. 116, 101st Cong., 2nd Sess. At 84–86, U.S.C.C.A.N. at 366–369); *see also Chabner,* 994 F.Supp. at 1191.

Based on the legislative history, the DOJ interpretation of Title III of the ADA, and the reasoning adopted by a growing number of district courts, this Court finds that Title III of the ADA is applicable to insurance policies and not limited to access to actual physical structures.

### A. The McCarran–Ferguson Act

■ Defendant argues that the McCarran–Ferguson Act, 15 U.S.C. § 1012 *et seq.,* precludes application of the ADA to insurance policies because Title III is not intended to regulate the business of private insurance carriers. The McCarran–Ferguson Act provides, in relevant part:

No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically related to the business of insurance.

15 U.S.C. § 1012(b), *cited in Doe v. Mutual of Omaha Insurance Company,* 999 F.Supp. at 1195; *Leonard,* 967 F.Supp. at 805. The McCarran–Ferguson Act bars the application of a federal statute if:

(1) the statute does not specifically relate to the business of insurance; (2) a state statute has been enacted for the purpose of regulating the business of insurance; and (3) the federal statute would invalidate, impair, or supersede the state statute.

*Doe v. Norwest Bank Minnesota N.A.,* 107 F.3d 1297, 1305 (8th Cir.1997) (citations omitted). In *Doe v. Norwest Bank Minnesota,* the Eighth Circuit addressed the application of the McCarran–Ferguson Act in the context of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In *Doe v. Norwest Bank Minnesota,* both parties agreed that RICO does not specifically relate to the business of insurance and that Minnesota has enacted a "comprehensive statutory scheme to regulate the business of insurance." *Id.* at 1306. The only issue in dispute before the Eighth Circuit was therefore whether the application of RICO would "invalidate, impair, or supersede" Minnesota's insurance laws, which were parallel in substance to RICO but provided for different remedies. *Id.* The court noted that while relevant Minnesota law allowed only for administrative agency enforcement rather than a private cause of action and provided only for possible fines and injunctive relief, RICO expressly grants treble damages, costs, and attorney fees to victorious plaintiffs. *Id.* at 1306. The court determined that the RICO recovery was "significantly greater than that which the state has authorized" by providing "remedies .. among the most severe ever enacted in a federal civil statute." *Id.* at 1306–07 (citations omitted). The court therefore held that because of the severity of the RICO remedies, their application to the present case would "impair" Minnesota's regulatory scheme. *Id.* at 1307–1308.

The present case can be distinguished from *Doe v. Norwest Bank Minnesota,* however, as the ADA, unlike RICO, is specifically related to the business of insurance and the ADA does not impair, invalidate, or supersede relevant Minnesota state law.

This Court identifies two fundamental provisions of the ADA that specifically relate to

the business of insurance. The Court finds that the "subterfuge" provision of the ADA, see supra, 42 U.S.C. § 12201(c), which prohibits the use of the Safe Harbor provision to evade the purpose of Title III of the ADA is a statutory provision specifically related to the business of insurance. See Doe v. Mutual of Omaha Insurance Company, 999 F.Supp. at 1195. The Court also interprets the inclusion of an "insurance office" as an entity considered a public accommodation for the purposes of Title III of the ADA, see 42 U.S.C. § 12181(7)(F), as an explicit indication that the ADA is intended to specifically relate to the business of insurance.

Even if the Court had concluded otherwise, however, the McCarran–Ferguson Act would be inapplicable to the present case. As with the RICO provisions in Doe v. Norwest Bank Minnesota, the substantive provisions of the ADA and the relevant Minnesota statutes are similar in the present case. See infra, Minn.Stat. § 72A.20, subd. 9, 19. Unlike RICO, however, the ADA does not provide for extraordinarily punitive damages— treble damages, costs, and attorney fees-and therefore does not allow damages so substantial that they impair the regulatory scheme established by Minnesota state law. To the contrary, as both parties agree, Title III of the ADA does not provide for punitive damages. See 42 U.S.C. § 12188, § 2000a–3. The present case can therefore be distinguished from Doe v. Norwest Bank Minnesota and instead compared to National Association for the Advancement of Colored People v. American Family Mutual Insurance Company, 978 F.2d 287 (7th Cir.1992). In NAACP, the court held that the federal Fair Housing Act, which provides for a private cause of action, did not supersede, impair, or invalidate the substantively similar applicable Wisconsin statutes which can only be enforced by administrative agencies. The court found that "in the main, federal regulation of a subject... does not prevent states from adding remedies to the arsenal established by federal law. The McCarran–Ferguson Act is a form of inverse preemption, so principles defining when state remedies conflict with ... federal law are pertinent in deciding when federal rules 'invalidate, impair, or supersede' state rules." Id. at 296. The court

in NAACP held that as "duplication is not conflict" and that, as a general rule, "state and federal rules that are substantively identical but differ in penalty do not conflict with or displace each other," the McCarran–Ferguson Act did not bar plaintiff's Fair Housing Act claims. Id. at 295, 297. This Court finds the reasoning in NAACP persuasive and apposite to the present case and therefore holds that the McCarran–Ferguson Act does not "invalidate, impair, or supersede" the relevant Minnesota statutes and does not bar plaintiff's ADA claims.

## IV. The Safe Harbor Provision

As indicated above, the ADA provides a Safe Harbor provision for insurance providers under the ADA. See supra, 42 U.S.C. § 12201(c). Under the Safe Harbor provision, the risk underwriting engaged in by insurance companies must be based on or not inconsistent with state law. Chabner, 994 F.Supp. at 1191. The subterfuge provision, see supra 42 U.S.C. § 12201(c), provides, however, that even if an insurer's practices are consistent with applicable state law, they can still violate the ADA if plaintiff demonstrates that the insurance policies are a subterfuge to evade the purpose of the ADA. See Doukas, 950 F.Supp. at 430. Thus, the Court must perform a two-part analysis to determine whether the IDS policies in question violate the Safe Harbor provision of the ADA: (1) is the eligibility criteria employed by IDS based on and consistent with state law; and (2) is the eligibility criteria a subterfuge to evade the purposes of the ADA.

Minn.Stat. § 72A.20 provides in relevant part:

Subd. 9. Discrimination between individuals of the same class. Making or permitting any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of accident or health insurance or in the benefits payable thereunder, or in any terms or conditions of such contract, or in any other manner whatever, or in making or permitting the rejection of an individual's application for accident or health insurance

coverage, as well as the determination of the rate class for such individual, on the basis of a disability, shall constitute an unfair method of competition and an unfair and deceptive act or practice, unless the claims experience and actuarial projections and other data establish significant and substantial differences in class rates because of the disability.

Subd. 19. Support for underwriting standards. No life or health insurance company doing business in this state shall engage in any selection or underwriting process unless the insurance company establishes beforehand substantial data, actuarial projections, or claims experience which support the underwriting standards used by the insurance company. The data, projections, or claims experience used to support the selection or underwriting process is not limited to only that of the company. The experience, projections, or data of other companies or a rate service organization may be used as well.

Minn.Stat. § 72A.20, subd. 9, 19. IDS categorically denies long-term disability insurance to any applicant who has been treated for a mental health condition within the past year, allowing the applicant to be reconsidered after one year has passed since the last treatment. To comply with Minnesota law, IDS must justify such eligibility criteria with claims experience, actuarial projections, or other data to "establish significant and substantial differences in class rates because of the disability." *Id.* at subd. 9.

IDS asserts that it has presented such justification for its eligibility criteria and therefore does not violate state law. The Court acknowledges that IDS presents specific industry data based on claims experience and actuarial projections that show a dramatic increase in payments on long-term disability insurance claims due to mental health and nervous disorders. Plaintiff counters that while Defendant establishes that claims for disability due to mental or nervous conditions have increased since 1989, Defendant fails to demonstrate that individuals receiving treatment for mental or nervous conditions at or near the time of application for insurance are more likely to file claims

under their long-term disability insurance. Furthermore, Plaintiff notes that the *Paul Revere Underwriting Manual* includes various impairments, such as dysthymia, and establishes procedures for processing applications from individuals with such impairments without recommending total denial of insurance for such applicants. Implicit in Plaintiff's observation is a challenge to the "substantial" actuarial data and claims experience presented by Defendant and their applicability to Plaintiff's situation. Thus, Plaintiff claims that a genuine issue of material fact exists as to whether IDS' long-term disability insurance eligibility criteria conforms to sound actuarial principles, claims experience, or substantial data as required by Minnesota state law. The Court agrees and denies summary judgment on the matter.

Defendant also asserts that it is entitled to Safe Harbor protection under Title III of the ADA because its eligibility criteria are not a subterfuge. *See supra*, 42 U.S.C. § 12201(c). The issue of subterfuge arises only if it is determined that Defendant's practices are based on or not inconsistent with Minnesota law. As this Court has determined that a genuine issue of material fact exists as to whether IDS eligibility criteria violates Minnesota law, the Court need not pass on the issue as to whether the criteria is a subterfuge of the ADA.

### V. Disability–Based Distinction Under the ADA

 Plaintiff asserts that the IDS policy of denying long-term disability insurance to all applicants having received mental health treatment within the past year is founded on a disability-based distinction violative of the ADA. Courts have found that broad-based distinctions that distinguish between mental and physical health conditions do not qualify as illicit disability-based distinctions under the ADA because the ADA is only applicable to discrimination against disabled persons compared to non-disabled persons, not discrimination among the disabled. *See Parker*, 121 F.3d 1006 (the ADA prohibits discrimination between the disabled and non-disabled but does not mandate equality between individuals with different disabilities); *see also*

*Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Modderno v. King,* 82 F.3d 1059 (D.C.Cir.1996); *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618; *Ford v. Schering–Plough Corporation,* 145 F.3d 601 (3rd Cir.1998). Furthermore, the EEOC, Interim Enforcement Guidance on the Application of the Americans with Disabilities Act of 1990 to Disability–Based Distinctions in Employer Provided Health Insurance ("EEOC Interim Guidance"),[3] establishes the following:

> Some employer provided health insurance plans ... [distinguish] between the benefits provided for the treatment of physical conditions on the one hand, and the benefits provided for the treatment of "mental/nervous" conditions on the other ... Such broad distinctions, which apply to the treatment of a multitude of dissimilar conditions and which constrain individuals both with and without disabilities, are not distinctions based on disability.

*Krauel,* 95 F.3d at 678 (citing EEOC Interim Guidance, (June 8, 1993), reprinted in Fair. Empl.Prac.Man. 405:7115, 7118(BNA)(footnote omitted)).

The aforementioned cases and the EEOC Interim Guidance, however, address disability-based discrimination among the disabled that affects the quality and extent of coverage offered to one class of disabled as compared to *another* and do not address the categorical denial of access to insurance coverage to a class of disabled individuals. When courts have addressed the exclusion of a class of disabled from an insurance plan, they have found such exclusions violative of the ADA. In *Ford,* 145 F.3d at 608, the Third Circuit held, "So long as every employee is offered the same plan regardless of that employee's contemporary or *future* disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities" (emphasis added). *See also Parker,* 121 F.3d at 1015–16 ( "because all the employees at Schering–Plough, whether disabled or not, received the same access to the long-term disability plan, nei-

ther the defendants nor the plan discriminated between the disabled and the able bodied"); *EEOC v. CNA Ins. Companies,* 96 F.3d 1039 (7th Cir.1996) (rejecting plaintiff's challenge to CNA's distinction between benefits for mental and physical illness on grounds that CNA did not discriminate because it offered its plan to everyone, did not charge higher prices to disabled-believing they might require more benefits-and did not vary terms of its plan depending on whether an applicant was able-bodied or disabled); *Anderson v. Gus Mayer Boston Store of Delaware,* 924 F.Supp. 763 (E.D.Tex.1996)(finding that while the ADA allows some disability-based distinctions within insurance policies, when complete denial of coverage is at issue, disability based distinctions are impermissible).

Legislative history of Title III of the ADA further supports the proposition that while disability-based distinctions in an insurance policy's terms are permissible under the ADA, a policy to deny insurance coverage categorically to mentally disabled is unacceptable:

> [W]hile a plan which limits certain kinds of coverage based on classification of risk would be allowed under this section, the plan *may not refuse to insure,* or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience....

> [T]his legislation could arguably find violative of its provisions any action taken by an insurer or employer which treats disabled persons differently under an insurance or benefit plan because they represent an increased hazard of death or illness.

S.Rep. No. 116, 101st Cong. 1st Sess. (1989), *cited in Doukas,* 950 F.Supp. at 428 (emphasis added); *see also* H.R.Rep. No. 101–485,

---

**3.** The EEOC has not issued guidelines specifically addressing ADA application to long-term dis-

ability insurance.

pt. 2, at 136–137 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 419–420, *cited in Doe,* 999 F.Supp. at 1193; *Chabner,* 994 F.Supp. at 1191. This Court finds that as Defendant's policy of denying long-term disability insurance to those treated for mental conditions within the past year denies said individuals *access* to insurance coverage, the policy is founded on a disability-based discrimination violative of the ADA.

## VI. Minnesota Human Rights Act

The Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.01, subd. 13, defines disability in terms similar to those used in the ADA. The Minnesota District Court has held that federal precedent may be used to construe the MHRA and that analysis under the ADA controls a MHRA claim. *Reiff v. Interim Personnel, Inc.,* 906 F.Supp. 1280, 1292 (D.Minn.1995)(citing *Sigurdson v. Carl Bolander & Sons, Co.,* 532 N.W.2d 225, 227 (Minn.1995); *State, by Cooper v. Hennepin County,* 441 N.W.2d 106, 110 (Minn. 1989); *Heise v. Genuine Parts Co.,* 900 F.Supp. 1137, 1153–54 (D.Minn.1995)). This Court's analysis of Plaintiff's claim under the ADA developed above is therefore also applicable to her MHRA claim.

### A. Punitive Damages

■ Plaintiff seeks punitive damages under the MHRA. In order to recover punitive damages under the MHRA, Plaintiff must meet the standard set forth in Minn.Stat. § 549.20:

Subd. 1. Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

Subd. 3. Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject.

Minn.Stat. § 549.20, Subd. 1, 3. Considering the factors articulated in Minn.Stat. § 549.20, this Court finds as a matter of law that the eligibility criteria for IDS' long-term disability insurance does not demonstrate willful indifference to Plaintiff's rights and therefore does not warrant punitive damages. The Court therefore grants Defendant's motion for summary judgment on the matter of punitive damages.

### ORDER

Accordingly, based on the foregoing and all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

Defendant's motion for summary judgment is GRANTED as to plaintiff's claim for punitive damages under the MHRA and DENIED in all other respects.